The STATE of Ohio, Appellee,

v.

WARREN, Appellant.

[Cite as *State v. Warren* (1998), 129 Ohio App.3d 598.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–970990.

Decided Aug. 28, 1998.

600

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, *Steven W. Rakow* and *James M. Keeling*, Assistant Prosecuting Attorneys, for appellee.

*Schuh & Goldberg, Raul E. Tellez* and *Richard J. Goldberg*, for appellant.

PAINTER, Judge.

This case illustrates the distinction between a *Terry* stop and a *Terry* frisk. But a frisk is obviously much more intrusive than a stop, and must be justified by a reasonable belief that the person is armed.

On an early evening in June 1997, while still daylight, Officers Rhone and Bruner were on bicycle patrol in the Over–the–Rhine section of Cincinnati. Rhone saw defendant-appellant Quincy D. Warren with another man on a street corner. The two men saw the officers, and one of the men dropped a tissue to the ground. The officers were unsure which man had dropped the tissue. Both of the men began to walk away. Rhone became suspicious, and both officers rode over to the tissue. Bruner rubbed his foot against the tissue and believed that it held a small amount of crack cocaine.

The officers then approached the two men. Rhone grabbed Warren and patted him down. He felt what he perceived to be a plastic bag, about the size of a fifty-cent piece, in Warren's crotch area. Rhone asked Warren what the object in his pants was, and Warren told him it was crack. Rhone arrested Warren, and during a strip search at the police station, a bag of crack was discovered in Warren's underwear.

Warren attempted to suppress the evidence seized, but the trial court over-ruled his motion. Warren then pleaded no contest to a charge of cocaine possession. He was sentenced to four years' incarceration for this offense. Warren now brings one assignment of error, challenging the trial court's decision to overrule his motion to suppress.[1]

At a suppression hearing, the credibility of the witnesses is an issue for the trier of fact.[2] Accepting the findings of the trier of fact as true, an appellate court must determine as a matter of law, without deference to the trial court's conclusion, whether the trial court erred in applying the substantive law to the facts of the case.[3]

---

**1.** We *sua sponte* remove this case from the accelerated calendar.

**2.** See *State v. Mills* (1992), 62 Ohio St.3d 357, 582 N.E.2d 972; *State v. Fanning* (1982), 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583.

**3.** See *State v. Klein* (1991), 73 Ohio App.3d 486, 597 N.E.2d 1141.

■ Warren concedes that the officers had a reasonable, articulable suspicion that criminal activity was afoot and had the right to stop him under *Terry v. Ohio.*[4] The only issue in this case is whether Officer Rhone had the right to conduct a pat-down search under the totality of the circumstances. We agree with Warren that Rhone did not.

■ The Fourth and Fourteenth Amendments to the United States Constitution prohibit warrantless searches and seizures. Unless an exception applies, warrantless searches are *per se* unreasonable.[5] One exception was created in *Terry,* in which the United States Supreme Court balanced the right to be free from unreasonable searches and seizures against the need to protect the police and the public. Under *Terry,* a police officer may frisk a detainee's outer clothing for concealed weapons when the officer has a reasonable suspicion that the suspect is armed and dangerous (the language "and dangerous" seems to be surplusage, as we have a hard time contemplating a situation where an armed individual suspected of criminal activity would *not* be considered dangerous). An officer need not be certain that a detainee is armed, but the officer's suspicions about the presence of a weapon must be reasonably aroused to conduct this protective search.[6]

■ The prosecution has the burden to establish the reasonableness of a *Terry* frisk.[7] Construing *Terry,* in *State v. Bobo,*[8] the Ohio Supreme Court stated in a syllabus paragraph: "Where a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others." The standard is an objective one based on the particular circumstances; an officer's unreasonable subjective belief will taint the fruits of a protective search.[9]

In *Bobo,* the court held that the officers reasonably both stopped and searched the defendant based on seven factors: (1) the high-crime area where weapons

---

4. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

5. *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585; *State v. Hines* (1993), 92 Ohio App.3d 163, 634 N.E.2d 654.

6. See *State v. Smith* (1978), 56 Ohio St.2d 405, 407, 10 O.O.3d 515, 516, 384 N.E.2d 280, 281; *Hines, supra.*

7. See *State v. Pearson* (1996), 114 Ohio App.3d 168, 682 N.E.2d 1086; *State v. Hunter* (1994), 98 Ohio App.3d 632, 649 N.E.2d 289.

8. *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489, paragraph two of the syllabus.

9. See, generally, *State v. Andrews* (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271.

were prevalent; (2) it was nighttime, when weapons could be easily hidden; (3) one of the officer's extensive experience with drug and weapon activity; (4) the officer's knowledge of how drug transactions occurred in that area; (5) the officer's observations of the defendant's movements, which seemed to indicate that he had hidden something under the front seat of the car; (6) the officer's experience in recovering weapons or drugs after observing such furtive movements; and (7) the officers were out of their vehicle and away from protection if defendant had been armed. Although the *Bobo* decision is not directly on point because the officers searched the car's passenger compartment to which Bobo had immediate access, the factors the court used to uphold the protective search have also been used to determine the reasonableness of protective searches of a person.[10]

Though the court used all of the seven factors to justify the reasonableness of both the stop and the search, we believe that some factors are more applicable to either one or the other. But that aside, the circumstances favoring the weapons search in *Bobo* were patently more compelling than the circumstances we must review here.

The Ohio Supreme Court had another opportunity to determine whether a protective search comported with the Fourth Amendment in *State v. Andrews.*[11] In *Andrews,* an officer in a dark courtyard in a high-crime area, alone and away from his cruiser, encountered Andrews running toward him. The officer shined his light on Andrews, who threw down a can of beer. From these facts, the Ohio Supreme Court held, over a vigorous dissent, that the officer was justified in frisking Andrews.

Comparing the circumstances in *Bobo* and *Andrews* to the circumstances here, we conclude that Officer Rhone did not articulate a reasonable suspicion that Warren was armed, and thus he had no right to perform a protective search. At the suppression hearing, the following exchange took place between Warren's attorney and Officer Rhone concerning his reasons for frisking Warren:

"Q: You had no reason to believe Mr. Warren had a weapon when you patted him down?

"A: No reason. I didn't know that he did not have a weapon.

---

**10.** The United States Supreme Court has extended the protective search to the passenger compartment of a vehicle, limited to those areas in which a weapon may be placed or hidden, in *Michigan v. Long* (1983), 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201.

**11.** *State v. Andrews* (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271.

"Q: I understand that. But between the time you first saw him and the time you grabbed him and patted him down, is there anything that gave you suspicion that he was armed and dangerous?

"A: No. But for my safety I usually pat people down. Always pat people down especially in Over–the–Rhine.

"Q: You always pat people down in Over–the–Rhine?

"A: When I stop them for investigation and my safety, yes, I do.

"Q: No matter what the suspicion is?

"A: Anything."

From this dialogue, it is clear that Officer Rhone did not have a reasonable suspicion that Warren was armed. The only factor that he pointed to for frisking Warren was that he was in Over–the–Rhine, which he later explained was a high-crime neighborhood. We hold that this was not enough to conduct a protective search, even after a valid *Terry* stop.[12]

Even in a high-crime neighborhood, an officer must have a reasonable, articulable suspicion that the detainee is armed. Though the area certainly is a factor to be considered, it can never stand alone to validate a protective search. Officer Rhone simply did not articulate a reasonable suspicion for searching Warren. In *Bobo*, the confrontation occurred in a high-crime neighborhood, but it was also nighttime and the detainee had made furtive movements that made the officers believe he might have placed a weapon under his seat. And, in *Andrews*, the confrontation was also in the dark, the officer was alone, and Andrews made a quick movement that the court somehow seemingly relied on to show that the officer had a reasonable suspicion that Andrews was armed. In contrast, here, Officer Rhone confronted Warren in daylight, and Warren had made no furtive movements and had given no indication that he was armed. Further, Officer Rhone was not alone, but had the added security of a partner next to him. And though Rhone testified that he had been involved in prior drug cases involving crack cocaine, he never elaborated on his experience.[13] This

---

12. See, also, *State v. Potts* (Dec. 7, 1994), Washington App. No. 93 CA 29, unreported, 1994 WL 693916 (holding *Terry* frisk unwarranted where there was no testimony that the officer thought Potts was armed); *State v. Franklin* (1993), 86 Ohio App.3d 101, 619 N.E.2d 1182 (stating that officer never articulated reasonable suspicion for conducting frisk); *State v. Stoken* (Jan. 25, 1989), Hamilton App. Nos. C–880006 and C–880007, unreported, 1989 WL 4723 (holding frisk improper where officers did not fear for their safety); *State v. Taylor* (July 13, 1998), Stark App. No.1997CA00321, unreported, 1998 WL 429917.

13. "A court reviewing the officer's actions must give due weight to his experience and training and view the evidence as it would be understood by those in law enforcement." *Andrews*, *supra*, 57 Ohio St.3d at 88, 565 N.E.2d at 1273, citing *United States v. Cortez* (1981), 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621.

testimony did not establish that Rhone's experience with drug transactions somehow aroused his suspicion that Warren was armed.

■ We recognize that the nature of the suspected offense for which an individual is stopped may contribute to, or altogether establish, a suspicion that the individual is armed.[14] For example, one commentator suggests that suspicion that an individual "has committed, was committing, or was about to commit a type of crime for which the offender would likely be armed"—such as robbery, burglary, rape, assault with weapons, homicide, and dealing or possession of large quantities of drugs—would provide a reasonable suspicion to frisk.[15] This rationale was evidently followed by the Ohio Supreme Court in *State v. Williams*.[16] In *Williams*, the court upheld a search where an officer, acting alone, had just discovered a large quantity of growing marijuana that three men were actively harvesting. The officer suddenly encountered Williams, who gave the officer implausible reasons for his presence. The court held that these circumstances provided the officer with enough suspicion that Williams was armed to perform a protective search.

■ However, the same commentator specifically notes that suspicion that an individual is trafficking in small quantities of drugs is not enough to justify a belief that the individual is armed.[17] We agree. Officers Rhone and Bruner saw a tiny amount of what they believed to be crack cocaine in a tissue—such a small amount that they did not field-test it or charge Warren for it, and evidently left it on the city street. We refuse to hold that the nature of this suspected crime, even in a high-crime area, provided the justification to frisk Warren.

■ If a valid *Terry* stop in a high-crime neighborhood is by itself enough to frisk, those living in impoverished neighborhoods ridden with crime could be frisked for weapons any time an officer suspected a crime.[18] Justice Wright, in

---

**14.** See, *e.g., Adams v. Williams* (1972), 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612.

**15.** See 3 LaFave, Search and Seizure, A Treatise on the Fourth Amendment (2 Ed.1987) 506–507, cited in O'Connell, Search and Seizure: The Erosion of the Fourth Amendment Under the *Terry* Standard, Creating Suspicion in High Crime Areas (1991), 16 U.Dayton L.Rev. 717, 744.

**16.** *State v. Williams* (1990), 51 Ohio St.3d 58, 554 N.E.2d 108.

**17.** Lafave, *supra.*

**18.** See *State v. Shepherd* (1997), 122 Ohio App.3d 358, 701 N.E.2d 778, quoting *State v. Jones* (1990), 70 Ohio App.3d 554, 559, 591 N.E.2d 810, 813 ("[a] person's mere presence in an area of high crime activity does not suspend the protections of the Fourth Amendment").

his dissent in *Andrews*, argued against a stratification of rights based on an individual's location, stating that "[a] citizen's Fourth Amendment rights are the same regardless of his residence, station in life or where he happens to be when he encounters a police officer." [19] In *Maryland v. Buie*, the United States Supreme Court stated that "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." [20] In further support of this proposition, the Ohio Supreme Court adopted a decision by the Montgomery County Court of Appeals holding that the fact that an investigatory detention occurs in a high crime area is not sufficient, by itself, to justify a stop. [21] The Constitution does not allow such a polarization of Fourth Amendment rights.

Because the frisk of Warren violated the Fourth Amendment, the tainted fruits of the search should have been suppressed. [22] The exclusionary rule applies not only to primary evidence directly obtained during an illegal search or seizure, but also to derivative evidence. Derivative evidence is evidence discovered from knowledge gained by the police as a result of an illegal search or seizure. [23] This type of evidence is known as the fruit of the poisonous tree.

A "but for" test is not used when applying the exclusionary rule. [24] Thus, evidence need not be excluded merely because it would not have been found but for the improper search or seizure. To determine whether evidence is excludable fruit of the poisonous tree, the proper question to ask is whether the evidence was obtained by exploitation of an illegal frisk or instead by means sufficiently distinguishable to be purged of the primary taint. [25] Rhone did not remove the bag of crack when performing the protective search, and thus the evidence was not directly obtained from the improper search. But we do not believe that Warren's statement, when questioned, that the object in his pants

---

19. *Andrews, supra*, 57 Ohio St.3d at 89, 565 N.E.2d at 1274–1275 (Wright, J., dissenting).

20. *Maryland v. Buie* (1990), 494 U.S. 325, 334, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276, 286, fn. 2.

21. *State v. Carter* (1994), 69 Ohio St.3d 57, 65, 630 N.E.2d 355, 362.

22. *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

23. *State v. Kelly* (Sept. 24, 1993), Clark App. No. 3007, unreported, 1993 WL 402769, citing *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319.

24. *Wong Sun, supra*; *United States v. Leon* (1984), 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677.

25. *Wong Sun, supra*, at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455–456.

was crack cocaine, was sufficiently removed from the impropriety of the search to permit its admissibility.

Further, the evidence would not have been inevitably discovered, nor would it have been exposed by an independent source. The officers had no probable cause to arrest Warren because they were unsure who had dropped the tissue; additionally, the tissue was never even proven to have contained cocaine. Therefore, the crack cocaine in Warren's underwear would not have been discoverable in a search incident to arrest. We also refuse to hold that Warren's admission about possession of the crack cocaine was an independent source and distinct from the improper search. At the point Warren admitted to having the crack, he had already been subjected to a violation of his constitutional rights. Warren had no legitimate reason to think that the officer would not have pressed him further, or further violated his right to be free from an unreasonable search, if he did not answer the officer's question truthfully.

Therefore, the evidence of the crack cocaine must be excluded from this criminal proceeding. The trial court erred in overruling Warren's motion to suppress, and we must therefore overturn Warren's conviction and remand this case to the trial court for further proceedings consistent with this decision and law.

As stated at the outset, this is an unusual case. This decision should in no way be read to curtail the ability of an officer to conduct a protective search of any individual after a valid *Terry* stop when the officer in fact has a good-faith, articulable suspicion that the detainee is armed. Certainly, the safety of the police and the public is paramount when such a suspicion is actually, objectively aroused.

*Judgment reversed*
*and cause remanded.*

GORMAN, J., concurs.

SUNDERMANN, P.J., dissents.

SUNDERMANN, Presiding Judge, dissenting.

I respectfully dissent. I disagree with the majority on only one point, although it is an important one. We agree that the officer's stop of Warren was reasonable under *Terry*.[26] The next question is, could the officer frisk Warren

---

26. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

under these circumstances without violating his constitutional rights? Contrary to the majority, I conclude that he could.

Whether an officer can frisk a suspect must be viewed in light of the totality of the circumstances and must be viewed through the eyes of a reasonable and experienced police officer. If, during an investigative stop, an officer has a reasonable suspicion that an individual is armed based on the totality of the circumstances, he may initiate a protective search for the safety of himself and others.[27] That is, I believe, what occurred here.

In this case, Officers Rhone and Bruner were in a high-crime area when they saw Warren and another man on a street corner. Their suspicions were aroused when a tissue was dropped to the ground and the men began walking away, after having viewed the officers. Rhone and Bruner approached the tissue, and Bruner tactilely examined it. Based on this examination, he believed that the tissue contained crack cocaine. Rhone then approached Warren, making a *Terry* stop. He proceeded to pat him down and felt what he believed was a plastic bag. When questioned about the bag, Warren conceded that it contained crack cocaine. Subsequent analysis confirmed this to be true.

The majority says that an individual's presence in a high-crime area, alone, is not sufficient grounds on which to conduct a *Terry* frisk, and I agree. But I believe that there was considerably more than that present in this case—the officers also suspected that Warren was trafficking drugs. In *State v. Williams*,[28] an officer came upon a defendant who was growing and harvesting marijuana. In upholding the officer's frisk of this defendant, the court reasoned that the officer knew that individuals involved in drug trafficking were likely to be armed and dangerous; therefore, the court concluded that the officer was entitled to frisk the defendant for his own protection. I disagree with the majority's conclusion that "suspicion that an individual is trafficking in small quantities of drugs is not enough to justify a belief that the individual is armed." Rather, I conclude that Rhone's suspicion that Warren was engaged in drug trafficking, in combination with the fact that Warren was engaged in this suspected conduct in a high-crime area, provided Rhone with the requisite reasonable suspicion to justify his frisk of Warren. Accordingly, I would affirm the trial court's judgment.

---

27. *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489, paragraph two of the syllabus.

28. *State v. Williams* (1990), 51 Ohio St.3d 58, 554 N.E.2d 108.